22CA1592 Peo v Maniz 10-03-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA1592
Morgan County District Court No. 21CR103
Honorable Carl S. McGuire, III, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Noe Maniz,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE TAUBMAN*
J. Jones and Sullivan, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 3, 2024

---

Philip J. Weiser, Attorney General, Lane Towery, Assistant Attorney General Fellow, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Rachel Z. Geiman, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1     Defendant, Noe Maniz, appeals the judgment of conviction entered on jury verdicts finding him guilty of first degree assault (causing serious bodily injury with a deadly weapon) and second degree assault (causing serious bodily injury).  We affirm.

## I.     Background

¶ 2     Maniz and R.B-G. spent a few days at a hotel trying to rekindle their relationship.  One night, R.B-G. left the hotel and went to the hospital.  She had a black eye, a cut to her face that required stitches, a facial fracture, and blood on her clothes.

¶ 3     Maniz was charged with nineteen counts, including first degree assault, second degree assault, third degree assault, violating bail bond conditions, violating a protection order, and domestic violence as a habitual offender.  A number of the charges were dismissed, and Maniz went to trial on first and second degree assault.

¶ 4     At trial, the events leading to R.B-G.'s injuries were highly disputed.  A hotel employee testified that the day before the incident, there had been yelling in the couple's hotel room and a complaint made to the front desk.  On the night of the incident, the employee heard crying coming from the hotel room and called the

1

nonemergency police number. Shortly after that, R.B-G. called the front desk to say she was leaving the hotel room to go to the hospital, Maniz had hit her, and she wanted the room locked so that Maniz could not re-enter.

¶ 5 The jury also heard from a responding police officer and viewed body camera footage of his interview with R.B-G. at the hospital. The officer said R.B-G., who did not appear to be intoxicated at the hospital, told him that Maniz had punched her when she asked him to leave the hotel room because she believed he was intoxicated.

¶ 6 However, according to R.B-G.'s testimony, she did not remember what had happened in the hotel room or at the hospital. She also said she had been very intoxicated that night and that her injuries were probably the result of an accident that occurred during rough, consensual sex over the bathroom sink. Though she could not recall the specific events, she said she remembered threatening to leave the hotel room at one point, but then offering to stay if Maniz had rough sex with her.

¶ 7 The jury convicted Maniz of first degree and second degree assault, including an act of domestic violence. The trial court

sentenced him to twenty-one years in the custody of the Department of Corrections.

## II. Discussion

¶ 8 Maniz contends that (1) the trial court erred by ruling that the defense opened the door to evidence of Maniz's prior domestic violence case involving R.B-G., and (2) the prosecutor committed misconduct by making a closing argument that included the equivalent of expert testimony and that misstated and shifted the burden of proof. We disagree with both contentions.

### A. Opening the Door

#### 1. Standards of Review and Reversal

¶ 9 We review a trial court's evidentiary rulings for an abuse of discretion. *Rojas v. People*, 2022 CO 8, ¶ 16, 504 P.3d 296, 302; *see also People v. Johnson*, 2021 CO 35, ¶ 16, 486 P.3d 1154, 1158 ("[W]e review a trial court's determination of whether a party opened the door to otherwise inadmissible evidence for an abuse of discretion."). A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law. *Johnson*, ¶ 16, 486 P.3d at 1158.

¶ 10   Maniz contends that the admission of evidence of his prior case involving R.B-G. violated his due process rights and therefore warrants reversal under the constitutional harmless error standard. *See Hagos v. People*, 2012 CO 63, ¶ 11, 288 P.3d 116, 119.  We disagree with this assertion.  The constitutional harmless error standard applies to errors "that specifically and directly offend a defendant's constitutional rights."  *People v. Flockhart*, 2013 CO 42, ¶ 20, 304 P.3d 227, 233 (quoting *Wend v. People*, 235 P.3d 1089, 1097 (Colo. 2010)).  We apply the nonconstitutional harmless error standard to determine if an erroneous evidentiary ruling warrants reversal.  *See People v. Kern*, 2020 COA 96, ¶ 13, 474 P.3d 197, 201; *Yusem v. People*, 210 P.3d 458, 469 n.16 (Colo. 2009) ("Erroneous admission of CRE 404(b) evidence is not error of constitutional dimension.").

## 2.   Applicable Law

¶ 11   Otherwise inadmissible evidence can become admissible if a party opens the door "by presenting incomplete evidence on a subject."  *People v. Heredia-Cobos*, 2017 COA 130, ¶ 20, 415 P.3d 860, 865.  When a defendant "opens the door to otherwise inadmissible evidence, [the prosecution] may then inquire into the

previously barred matter." *Golob v. People*, 180 P.3d 1006, 1012 (Colo. 2008). The "opening the door" doctrine prevents one party from gaining an unfair advantage through "the selective presentation of facts that, without being elaborated or placed in context, create an incorrect or misleading impression." *Id.* An opposing party may introduce otherwise inadmissible evidence "only to the extent necessary to 'rebut any adverse inferences which might have resulted,' or to correct 'an incorrect or misleading impression.'" *People v. Cohen*, 2019 COA 38, ¶ 26, 440 P.3d 1256, 1263 (citations omitted).

### 3. Additional Facts

¶ 12 Before trial, the prosecution moved to admit CRE 404(b) evidence of Maniz's prior domestic violence case involving R.B-G., in which R.B-G. recanted her allegations at trial, leading to Maniz's acquittal. The trial court ruled that the evidence was inadmissible because it did not find by a preponderance of the evidence that the underlying allegations in the case were true. However, the court found that — subject to a limiting instruction — "if [R.B-G.] testifies in contradiction to prior statements regarding the facts in this case, she is subject to impeachment with her prior statements regarding

the alleged events in this case" and "is also subject to impeachment through her prior inconsistent statements made in [the prior case with Maniz]."

¶ 13    At trial, after the prosecution rested, the defense called R.B-G. as its only witness. Defense counsel asked R.B-G. whether she had ever been helped by the district attorney's office. She testified that the district attorney's office never "tried to help" her, did not follow up with her, did not call her to ask how she was doing, did not offer her any resources, and did not "give [her] the opportunity to talk about what had happened that night." She further explained that she had only spoken to the victim's advocate "but not the prosecution, not the D.A., not law enforcement, until [she] took that upon [her]self."

¶ 14    The prosecutor argued that this testimony "opened the door" to evidence that the district attorney's office had had multiple communications with R.B-G. "in a case prior, as well as this case" and that R.B-G. had repeatedly indicated that she did not want to cooperate or testify. Over defense counsel's objection, the trial court ruled that the prosecution could introduce such evidence. Before the prosecutor continued with cross-examination, defense

counsel reiterated his objection that the door had not been opened to that evidence and that it would be improper impeachment evidence outside the scope of direct examination.

¶ 15    R.B-G. testified on cross-examination that this was not the first time she "had a case like this" with Maniz, she had had contact "multiple" times with the district attorney's office "regarding prior cases," she had not wanted to testify in those cases, and she had changed her story in those cases. R.B-G. also conceded that she had contact with the victim's advocate in this case:

> [PROSECUTOR:] And you recall that the Victim's Advocate in this particular matter reached out to you right after you got out of the hospital to extend help to you, didn't she?
>
> [R.B-G.:] Yes, the Victim's Advocate.
>
> [PROSECUTOR:] And she represents our office, doesn't she?
>
> [R.B-G.:] I would — yes.

R.B-G. did not elaborate on the details of the "prior cases" in her testimony.

¶ 16    The prosecution then called a victim/witness coordinator as a rebuttal witness. She testified that in "bad or felony cases" she reaches out to alleged victims to establish relationships, and that

7

she had spoken with R.B-G. in previous cases. She also said that R.B-G. "usually did not want to cooperate," did not want Maniz "to be held accountable on his charges," and did not want to testify.

¶ 17     The jury was not given a contemporaneous limiting instruction regarding this testimony. However, the trial court ultimately instructed the jury as follows: "You heard testimony related to other proceedings other than those charged in this case. The Defendant is to be tried for the crimes charged in this case, and no other. You are not to speculate about the charges, status, or outcomes of those other cases."

### 4.     Analysis

¶ 18     Maniz argues that R.B-G.'s testimony did not open the door to his prior case involving her because she only testified regarding the district attorney's communications with her in this case, and the testimony did not create an "incorrect or misleading impression" that needed to be corrected. The People respond that (1) R.B-G.'s testimony put her credibility at issue and subjected her to impeachment with prior acts showing a character for untruthfulness, and (2) she opened the door to impeachment with evidence of Maniz's prior case to explain her "demonstrably untrue

statements" about the prosecution's communications with her.  We agree with the People's first argument and thus need not reach the second.

¶ 19     "[E]vidence of specific acts used solely for impeachment is governed by [CRE] 608(b)."  *People v. Segovia*, 196 P.3d 1126, 1130 (Colo. 2008).  Under CRE 608(b)(1), the trial court, in its discretion, may permit cross-examination of a witness related to a specific instance of the witness's conduct if probative of the witness's "character for truthfulness or untruthfulness."

¶ 20     When R.B-G. took the stand, she put her credibility at issue.  *See Segovia*, 196 P.3d at 1130.  Here, the questioning about R.B-G.'s actual communications with the district attorney's office and about her changing her testimony in a prior case bore squarely on her "character for truthfulness or untruthfulness."  CRE 608(b)(1).  Accordingly, this evidence was admissible as impeachment evidence under CRE 608(b).  *See People v. Phillips*, 2012 COA 176, ¶ 63, 315 P.3d 136, 153 ("We may uphold the trial court's evidentiary decision on any ground supported by the record, even if that ground was not articulated or considered by the trial court.").

¶ 21    Moreover, Maniz was put on notice of the potential consequences of calling R.B-G. to testify by the trial court's order denying the prosecution's CRE 404(b) motion, but which contemplated "impeachment through [R.B-G.'s] prior inconsistent statements made in [the prior case with Maniz]."

¶ 22    Accordingly, the trial court did not abuse its discretion by admitting R.B-G.'s testimony, as elicited by the defense.

### B.    Prosecutorial Misconduct

¶ 23    Maniz contends that the prosecutor committed misconduct during rebuttal closing by (1) making an argument equivalent to expert testimony based on facts not in evidence and (2) misstating and shifting the burden of proof.  Because Maniz did not contemporaneously object to these statements at trial, we apply a plain error standard of review to both claims, and we discern no plain error.  *Hagos*, ¶ 14, 288 P.3d at 120.

### 1.    Standard of Review

¶ 24    We engage in a two-step analysis when reviewing claims of prosecutorial misconduct.  *People v. Sauser*, 2020 COA 174, ¶ 78, 490 P.3d 1018, 1034.  First, we examine whether the prosecutor's conduct was improper based on the totality of the circumstances.

*Id.* Second, we determine whether that conduct warrants reversal according to the proper standard of review. *Id.*

¶ 25 When determining whether a prosecutor's statements were improper and whether reversal is warranted, we consider the language used, the context of the statements, the strength of the evidence, whether the prosecutor improperly appealed to the jurors' sentiments, whether the misconduct was repeated, and any other relevant factors. *People v. Walters*, 148 P.3d 331, 335 (Colo. App. 2006).

¶ 26 Under the plain error standard, we will not reverse unless any misconduct was obvious and substantial. *Hagos*, ¶ 14, 288 P.3d at 120. An error is obvious if it contravenes (1) a statute; (2) a well-settled legal principle; or (3) Colorado case law. *People v. Pollard*, 2013 COA 31M, ¶ 40, 307 P.3d 1124, 1133. An error is substantial if it so undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. *People v. Smith*, 2018 CO 33, ¶ 24, 416 P.3d 886, 891.

¶ 27 "Prosecutorial misconduct in closing argument rarely constitutes plain error." *People v. Smalley*, 2015 COA 140, ¶ 37, 369 P.3d 737, 745. To warrant reversal under the plain error

11

standard, such misconduct must be "flagrantly, glaringly, or tremendously improper." *Domingo-Gomez v. People*, 125 P.3d 1043, 1053 (Colo. 2005) (quoting *People v. Avila*, 944 P.2d 673, 676 (Colo. App. 1997)).

## 2.     Expert Testimony

¶ 28     During rebuttal closing argument, the prosecutor showed a PowerPoint presentation, which included a photo showing blood on the bathroom sink and one showing blood on R.B-G.'s sweatshirt. In referencing the photos, the prosecutor said,

> This is the hoodie that [R.B-G.] was wearing when she went into the hospital. And you will notice a bit of a blood pattern here on the inside of that hoodie. . . . Now, ultimately, you will notice, as well, a pattern that is on the sink itself.
>
> . . . .
>
> If she were naked at the time, why [are] there clothing patterns on the sink that she was leaning on when she was injured, that she, herself, talks about leaning on. She was clearly clothed. Look — look at the fiber marks.
>
> Now, further, look at how these things match up, these fiber marks that were clearly on her shirt, because if you look at the photos here, blood had run down her face, it had pooled between her breasts and underneath her breasts, and, ultimately, it had led to a lo[t] of

12

> blood collecting right here, almost exactly where she might be leaning onto a sink.
>
> Now, this blood pattern would have also transferred onto a hoodie that she puts on and then goes to the hospital. So we know that she was wearing a shirt, that she leaned on the sink, that she put a shirt on — or possibly was wearing it at the time, and then went to the hospital to show. The physical evidence lines up with her being clothed when she was assaulted, not naked.

Defense counsel did not object.

¶ 29    Maniz contends that this amounted to misconduct because the photo of the sink had not been admitted into evidence, and, by talking about blood patterns, the prosecutor improperly presented expert opinion.

¶ 30    "During closing argument, a prosecutor has wide latitude and may refer to the strength and significance of the evidence, conflicting evidence, and reasonable inferences that may be drawn from the evidence." *Walters*, 148 P.3d at 334. To protect a defendant's right to a fair trial, a prosecutor may not refer to facts not in evidence during closing argument. *Id.* Prosecutors may not imply that they have specialized knowledge and expertise in particular matters, or encourage jurors to rely on such knowledge

and expertise, rather than to limit their deliberation to the facts in evidence and any resulting reasonable inferences. *See People v. Davis*, 280 P.3d 51, 54 (Colo. App. 2011) (stating that rule and concluding that the trial court erred by permitting an argument by the prosecutor that "effectively amounted to expert testimony").

¶ 31    A photo of the blood on the bathroom sink was admitted at trial as Exhibit 9. From our review of the record, the photo included in the prosecution's PowerPoint appears to be of the same subject as Exhibit 9 — the blood smear on the bathroom sink. The PowerPoint slide merely focuses on the blood smear. Although the PowerPoint slide shows more detail than Exhibit 9, the PowerPoint slide was not "new" evidence, and we cannot conclude that any difference between the photo and the slide casts serious doubt on the reliability of the judgment of conviction.

¶ 32    As to the prosecutor's discussion of blood patterns, "counsel may properly point to circumstances that may raise questions or cast doubt on a witness's testimony and draw reasonable inferences from the evidence as to the credibility of witnesses." *People v. Wallace*, 97 P.3d 262, 270 (Colo. App. 2004). Here, the prosecutor pointed out that one could infer from the physical evidence that

14

R.B-G. was clothed when she was bleeding, which would contradict her version of events that she sustained injuries while having sex, perhaps while fully naked. Although the prosecutor used the word "pattern," we conclude that this did not rise to the level of expert testimony.

¶ 33    *People v. Ramos*, 2017 CO 6, ¶¶ 9-10, 388 P.3d 888, 891, on which Maniz relies, is distinguishable. There, the supreme court concluded that "an ordinary citizen, without nineteen years of experience investigating thousands of cases involving blood, would not have been able to provide the same conclusions." *Id.* The supreme court also noted that the jurors asked the detective six questions based on his "training and experience." *Id.* Further, the court concluded that using technical terms like "spatter" and "cast-off" demonstrated "that forensics and the analysis of blood transfer — specifically the difference between cast-off and transfer — are technical areas not within the realm of an ordinary person's experience or knowledge." *Id.*

¶ 34    *Davis*, 280 P.3d at 51, is also distinguishable. In that case, despite no expert or lay testimony having been admitted "regarding trauma victims' experiences or any 'stages' they endure . . . the

prosecutor made argument and gave a slide presentation on these issues, while attempting to portray them as matters the jury would know from common sense or common experience." *Id.* at 53. The division concluded that the prosecution was describing a variation of "rape trauma syndrome," which was improper because it "implicated the results of social science research, and there is no reason to believe average jurors would be knowledgeable about the reactions and behaviors of rape victims." *Id.* at 53-54 (citation omitted). The division reasoned that "the prosecutor implied that he had specialized knowledge and expertise in such matters, perhaps derived from his position as a deputy district attorney who might be experienced in dealing with such victims," which "improperly encouraged jurors to rely on such supposed knowledge and expertise, rather than to limit their deliberation to the facts in evidence and the reasonable inferences therefrom." *Id.* at 54.

¶ 35     Here, in contrast to both of these cases, the prosecutor only asked the jurors to compare the blood patterns on R.B-G.'s hoodie with those on the sink. In so doing, the prosecutor was drawing reasonable inferences from the evidence as to R.B-G.'s credibility.

16

¶ 36    However, even if we assume, without deciding, that some of these arguments were improper, they were not flagrantly, glaringly, or tremendously improper. *People v. Allgier*, 2018 COA 122, ¶ 51, 428 P.3d 713, 723. Nor were they obvious or substantial. *Hagos*, ¶ 14, 288 P.3d at 120. The arguments were brief and isolated and constituted only a small part of the prosecutor's overall closing argument. *See Sauser*, ¶ 93, 490 P.3d at 1036. Further, the trial court instructed the jury before trial that closing arguments are not evidence. Moreover, defense counsel did not lodge a contemporaneous objection to this argument, and "[w]e may consider a lack of contemporaneous objection by the defendant as demonstrating 'the defense counsel's belief that the live argument, despite its appearance in a cold record, was not overly damaging.'" *Walters*, 148 P.3d at 334 (quoting *Domingo-Gomez*, 125 P.3d at 1054). Accordingly, we conclude that the prosecutor's arguments, even if improper, did not rise to the level of plain error.

### 3.    Misstating the Law and Shifting the Burden of Proof

¶ 37    In rebuttal closing argument, the prosecutor read aloud the reasonable doubt jury instruction and then argued as follows:

What that's trying to say, ladies and
gentlemen, is that reasonable doubt cannot be
hanged [sic] on mere possibilities. It can't be
hanged [sic] on mere what-ifs happened. And
that is the entirety of the defense's case. What
if they were having rough consensual
intercourse, and what if it got so rough that he
injured her?

But you will recognize what she doesn't
remember. She conveniently remembers all
the things surrounding that, but even she
can't testify to exactly what happened. They
have nothing but speculation about what
happened that night. And that is not
reasonable doubt. It's just not.

¶ 38    Maniz argues that by asserting that "reasonable doubt cannot

be hanged [sic] on mere possibilities," the prosecutor misstated the

law regarding reasonable doubt. Even if we assume that such a

statement was improper, we nevertheless conclude that it does not

rise to the level of plain error. The statement occurred only once.

Further, the trial court properly instructed the jury on the

reasonable doubt standard. Also, the prosecutor read the proper

standard to the jury just before making this statement. *See People*

*v. Caldwell*, 43 P.3d 663, 672 (Colo. App. 2001) (concluding that no

plain error occurred in the prosecutor's misstatement of the law in

18

closing argument because it only occurred once and the jury was otherwise properly instructed).

¶ 39     Maniz also argues that the prosecutor shifted the burden of proof by stating that the defense "ha[d] nothing but speculation about what happened that night."  We are not persuaded.

¶ 40     The prosecution bears the burden of establishing beyond a reasonable doubt every element of the offense with which the defendant is charged.  *People v. Santana*, 255 P.3d 1126, 1130 (Colo. 2011).  This burden never shifts, and the prosecutor should not suggest otherwise through argument or comment.  *Id.*  Even when a prosecutor's comments might imply that a defendant has the burden of proof, the comments do not constitute error if, considered in context, they do not actually shift the burden.  *Id.* at 1131.  An appellate court must evaluate the comments in light of the entire record to determine whether the prosecution actually shifted the burden of proof.  *Id.*  In assessing whether a prosecutor shifted the burden of proof, we consider the degree to which (1) the prosecutor specifically argued or intended to establish that the defendant carried the burden of proof; (2) the prosecutor's actions were a fair response to defense counsel's questioning and

comments; and (3) the court and counsel informed the jury about the defendant's presumption of innocence and the prosecution's burden of proof. *Id.* at 1131-32.

¶ 41    First, we do not perceive the prosecutor's comment as reflecting a specific intent to shift the burden of proof to Maniz. *See id.* at 1133 (finding no burden shifting where, in part, "the prosecutor never explicitly argued that the defendant [had] the burden of proof").

¶ 42    Second, the prosecutor's comment was a fair response to defense counsel's arguments. In the defense's closing, counsel emphasized R.B-G.'s version of the events that her injuries were likely the result of rough, consensual sex over the bathroom sink. The prosecutor's comment that the defense had "nothing but speculation" merely suggested that there was a lack of evidence supporting the defense's theory. *See People v. Walker*, 2022 COA 15, ¶ 41, 509 P.3d 1061, 1072 ("Commenting on the lack of evidence supporting a defense theory does not shift the burden of proof.").

¶ 43    Finally, the written jury instructions properly informed the jury that "[t]he burden of proof is upon the Prosecution to prove to

the satisfaction of the jury beyond a reasonable doubt the existence of all of the elements necessary to constitute the crime charged." *Cf.* COLJI-Crim. E:03 (2023). The elemental instructions and those pertaining to the inferences the jury could draw from the evidence also noted the prosecution's burden. Both the prosecutor's and defense counsel's closing arguments further reinforced the proper burden of proof. Further, the court instructed the jury at the beginning of trial regarding the proper burden of proof. In the absence of evidence to the contrary, we presume that the jury followed the trial court's instructions. *Santana*, 255 P.3d at 1132-33.

¶ 44　Therefore, we conclude that Maniz's prosecutorial misconduct claims fail.

### III. Disposition

¶ 45　The judgment of conviction is affirmed.

JUDGE J. JONES and JUDGE SULLIVAN concur.